# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

JOSHUA ELDRIDGE,                          )
                                          )
                    Plaintiff,            )
                                          )
          v.                              )      Case No. 1:22-cv-02005-TWP-TAB
                                          )
BRANDON WEDDELL Correctional Officer,     )
KONKLE SGT,                               )
                                          )
                    Defendants.           )

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Brandon Weddell ("Officer Weddell") and Sergeant Eric Konkle ("Sgt. Konkle) (collectively, "Defendants") (Dkt. 58). Plaintiff Joshua Eldridge ("Mr. Eldridge") initiated this action alleging that correctional officers at Pendleton Correctional Facility ("Pendleton") subjected him to excessive force in 2021 and then deprived him of medical attention for his injuries. Mr. Eldridge has not responded to the summary judgment motion and the deadline to do so has expired. However, because the Defendants' designated evidence leaves material facts in dispute, Defendants' Motion for Summary Judgment is **denied**.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because

those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Indiana Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

When a summary judgment motion is unopposed, facts alleged in the motion are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); *see* S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts). Even where a non-movant fails to respond to a motion for summary judgment, "the movant still has to show that summary judgment is proper given the undisputed facts." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (cleaned up).

## II. <u>FACTUAL BACKGROUND</u>

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Mr. Eldridge as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Although Mr. Eldridge has not responded to the summary judgment motion, he gave deposition testimony (Dkt. 59-1), and Defendants have designated videos of the incident that is the subject of Mr. Eldridge's claims. (See Dkts. 59-4, 59-5). Accordingly, Mr. Eldridge is given the benefit of any conflicts in the evidence and reasonable inferences from the evidence, but without vouching for the objective truth of any fact or expressing any opinion on the weight of the evidence. *Garofalo v. Village of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014); *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In December 2021, Mr. Eldridge was an inmate at Pendleton.  On December 6, 2021, Mr. Eldridge had an appointment with his caseworker, Michael Martin (Dkt. 59-1 at 15:24–16:7). Shortly before the appointment, a fight broke out between other inmates in the unit. As Mr. Eldridge walked to his appointment with the caseworker, a nondefendant officer mistakenly identified him as a participant in the fight (Dkt. 59-2 at ¶¶ 6–7).

Sgt. Konkle received a message that Mr. Eldridge participated in the fight and was walking toward the counselor's office. *Id.* at ¶ 8. Sgt. Konkle confronted Mr. Eldridge. *Id.* The video shows Mr. Eldridge entering the hallway outside the office with Sgt. Konkle immediately behind him (Dkt. 59-4 at 06:24). Mr. Eldridge does not appear to notice Sgt. Konkle walking behind him.

Sgt. Konkle unsuccessfully reaches for Mr. Eldridge's right arm with his left hand. *Id.* at 06:26. Mr. Eldridge quickly pulls his right arm away as he looks over his right shoulder. *Id.* Sgt. Konkle gave no verbal instructions or warning before trying to grab Mr. Eldridge's arm. (Dkt. 59-

1 at 20:18–21). As Mr. Eldridge pulls his arm away, he and Sgt. Konkle turn to face one another (Dkt. 59-4 at 06:28). Sgt. Konkle immediately places a radio to his mouth and calls other officers to the scene. *Id.*; (Dkt. 59-2 at ¶ 12). Mr. Eldridge can be seen shaking his head, speaking, and gesturing toward Caseworker Martin. (Dkt. 59-4 at 6:30).

Sgt. Konkle attests that Mr. Eldridge "took a defensive stance" after pulling away from him but does not elaborate on what made Mr. Eldridge's stance defensive (Dkt. 59-2 at ¶ 10). The video shows Mr. Eldridge standing with his hands at his sides. At one point, he turns his back to Sgt. Konkle.

Mr. Eldridge told Sgt. Konkle:

[D]on't do that, don't do that again, trying to let him know that the reason—don't do that, we're in a level 4 facility. There's 50 killers around us. Don't grab me from behind without letting me know who you are, you know.

(Dkt. 59-1 at 20:12–17). Sgt. Konkle attests that Mr. Eldridge became "argumentative" but he does not clarify what Mr. Eldridge said or how it was argumentative. *Id.* at ¶ 10.

Forty seconds after Sgt. Konkle attempts to grab Mr. Eldridge, three more officers arrive on the scene (Dkt. 59:4 at 7:07). As they approach Mr. Eldridge, he pats his hands on his chest, then quickly raises them in the air. *Id.* at 7:09. The first officer, a nondefendant, immediately presses an electrical stun gun (hereafter, "Taser") to Mr. Eldridge's chest. *Id.* at 07:11. Officer Weddell, approaches Mr. Eldridge and immediately points his Taser at Mr. Eldridge, holding it perhaps a foot from Mr. Eldridge's chest. *Id.* Mr. Eldridge steps backward, and the officers step toward him, continuing to point their Tasers toward his chest. *Id.* at 07:15.

Officer Weddell attests that Mr. Eldridge "began to resist" when he arrived on the scene and then refused to turn around and submit to restraints (Dkt. 59-3 at ¶¶ 7–9). During the time he is visible on the video, Mr. Eldridge does not turn around and submit to handcuffs, but he remains

still with his hands in the air. He does not engage in any observable resistance except by failing to turn around and submit to restraints.

When Mr. Eldridge steps backward, he steps behind a storage locker and out of view of the video camera. Caseworker Martin and another inmate are perhaps ten feet away from the officers in the opposite direction from Mr. Eldridge (Dkt. 59-4 at 07:15). After Mr. Eldridge disappears from view, Officer Weddell steps toward him, followed by Sgt. Konkle and a third nondefendant officer. *Id.* at 07:17. Caseworker Martin gestures toward the officers and appears to say something. *Id.* at 07:20. The first officer to point his Taser at Mr. Eldridge steps away and directs another inmate away from the crowd. *Id.* Eventually, that officer walks off camera toward the other inmate with his Taser raised.

After a few seconds, Mr. Eldridge's feet and lower legs can be seen extending beyond the storage locker. For about 45 seconds, the camera does not show the upper bodies of Mr. Eldridge or either defendant. *Id.* at 07:20–08:05. During this 45-second period, Officer Weddell used his Taser against Mr. Eldridge three separate times (Dkt. 59-3 at ¶¶ 10–12). After the first use of the Taser, Officer Weddell and Sgt. Konkle pull Mr. Eldridge to the ground. *Id.*; (Dkt. 59-2 at ¶ 16).

Officer Weddell attests that, before his first use of the Taser, he gave Mr. Eldridge "a warning that his continued refusal would lead to use of" the Taser (Dkt. 59-3 at ¶ 10). Officer Weddell further attests that Mr. Eldridge "continued to resist," prompting him to use "a drive stun . . . to gain compliance." *Id.* at ¶ 10. After Mr. Eldridge was on the ground, he "continued to actively resist and refused to present his hands for restraints." *Id.* at ¶ 12. Officer Weddell administered a second drive stun and then a third after Mr. Eldridge "continued to resist and refuse to present his hands to be restrained." *Id.* Mr. Eldridge presented his hands, and they were placed in cuffs. *Id.* at ¶ 13; (Dkt. 59-2 at ¶ 18).

5

Mr. Eldridge did not hear or understand an order to submit to handcuffs before he was pulled to the ground (Dkt. 59-1 at 26:3–6). He could only hear "a bunch of people screaming at" him. *Id.* Once he was on the ground, he heard officers telling him to "cuff up," but at that point, officers were holding his arms and legs, so he could not move. *Id.* at 25:20–26:2.

Sgt. Konkle or Officer Weddell, or both picked Mr. Eldridge up and slammed him on the ground (Dkt. 59-1 at 26:7–27:11, 29:13–30:13). He was tased while face down, on the ground, with officers holding each arm and leg such that he could not move. *Id.* at 26:13–21, 32:17–34:3. The officers held his arms straight out and did not attempt to place them in cuffs. *Id.* at 34:13–19.

Eventually, the video shows the Defendants help Mr. Eldridge to his feet. *Id.* at 08:05. At this point, his hands are cuffed behind his back. *Id.* The Defendants then lead Mr. Eldridge out the door and off camera. *Id.* at 08:20.

Officer Weddell escorted Mr. Eldridge to a dry cell in a segregated housing unit (Dkt. 59-1 at 36:11–23). As he escorted Mr. Eldridge, Officer Weddell used vulgar language and twisted Mr. Eldridge's arms and wrists inflicting pain. *Id.* at 36:24–37:12. When Mr. Eldridge told Officer Weddell he was in pain, Officer Weddell told him to "shut the f--- up." *Id.* at 37:23–38:4. Mr. Eldridge did not resist Officer Weddell in any way and was fully compliant with the escort. *Id.* at 38:13–18. On the way to the dry cell, Officer Weddell walked Mr. Eldridge past a nurse in the hallway. *Id.* at 40:17–25. The nurse asked Mr. Eldridge if he was suicidal but provided no other medical attention. *Id.* After he arrived at the cell, officers took photographs of his injuries but never arranged for him to receive any care for the injuries. *Id.* at 41:10–23. His knees were split open, his head was swollen, and he had blisters on his back, presumably from the Taser. *Id.* When Mr. Eldridge arrived at the dry cell, his injuries were photographed. *Id.* at 43:2–9. Neither Defendant was present. *Id.*

## III. DISCUSSION

When the Court screened Mr. Eldridge's Complaint pursuant to 42 U.S.C. § 1983, it found plausible Eighth Amendment claims against Officer Weddell and Sgt. Konkle. Mr. Eldridge's claims implicate the Eighth Amendment under three theories of liability: excessive force, failure to intervene, and deliberate indifference to serious medical needs.

## A.    <u>Excessive Force</u>

The Eighth Amendment protects inmates from cruel and unusual punishment, including excessive force by prison officials. *McCottrell v. White*, 933 F.3d 651, 662 (7th Cir. 2019). The Eighth Amendment allows officers to use force "in a good-faith effort to maintain or restore discipline." *Id.* at 664 (cleaned up). But malicious or sadistic force—even if it does not cause a serious injury—is prohibited. *Id.* To distinguish between good-faith and malicious force, courts consider several factors, including:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

*Id.* at 663; *see also Whitley v. Albers*, 475 U.S. 312, 321 (1986). Additionally, to survive summary judgment, a plaintiff must present evidence supporting "a reliable inference of wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322.

Nearly every fact material to this analysis is in dispute. Sgt. Konkle maintains that Mr. Eldridge assumed a "defensive stance" after he confronted him, (Dkt. 59-2 at ¶ 10), but video shows Mr. Eldridge standing with his hands at his sides. Officer Weddell maintains that Mr. Eldridge "began to resist" when he arrived on the scene, (Dkt. 59-3 at ¶¶ 7–9), but video shows him standing with his hands in the air. Officer Weddell maintains that he ordered Mr. Eldridge to submit to handcuffs before Tasing him, (Dkt. 59-3 at ¶ 10), but Mr. Eldridge maintains that he

heard no such orders (Dkt. 59-1 at 23:3–6). Officer Weddell maintains that Mr. Eldridge continued to resist the officers and refused to place his hands in restraints once he was on the ground, (Dkt. 59-3 at ¶ 12), but Mr. Eldridge maintains that officers had him pinned so that he could not move, even to present his hands to be cuffed (Dkt. 59-1 at 25:20–26:2). Further, Officer Weddell does not directly dispute Mr. Eldridge's testimony that he twisted his arms and wrists while escorting him to the dry cell (*See* Dkt. 59-3).

Viewing the evidence in the light most favorable to Mr. Eldridge, and resolving disputes in his favor, a trier of fact could reasonably find that Officer Weddell first used his Taser without issuing a warning and while Mr. Eldridge had his hands raised in the air. A trier of fact could reasonably determine that Mr. Eldridge did not present a threat to anyone's safety, or at least not a threat that required use of a Taser. A trier of fact could also reasonably find that the Defendants used more force than necessary when—after he had already been tased—they picked Mr. Eldridge up and slammed him into the ground. And, a trier of fact could reasonably determine that, if Mr. Eldridge ever posed a safety threat, that was no longer the case when the officers had him face down on the ground with his limbs immobilized. In short, a reasonable trier of fact could find— especially with respect to the second and third uses of the Taser—that the officers used far greater force than necessary to resolve any threat they reasonably perceived and that they did not make any efforts to temper the severity of their force. *McCottrell*, 933 F.3d at 664. Further proceedings are necessary to resolve Mr. Eldridge's claims of excessive force.

## B.    <u>Failure to Intervene</u>

"An officer who fails to intervene to try to prevent known cruel or unusual force, despite a reasonable opportunity to do so, may be held liable under [42 U.S.C.] § 1983." *Wilborn v. Ealey*, 881 F.3d 998, 1007 (7th Cir. 2018). More specifically:

> An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (emphasis in original). "A 'realistic opportunity' means a chance to warn the officer using excessive force to stop." *Gonzalez*, 761 F.3d at 826 (cleaned up). "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (cleaned up) (emphasis in original).

The Defendants argue that Sgt. Konkle is entitled to summary judgment on any failure-to-intervene claim because "Defendants did not use excessive force against Plaintiff." (Dkt. 60 at 14). For the reasons discussed in Part III(A) above, the evidence on that issue creates a material dispute. Because the Defendants assert no other basis for summary judgment, they are not entitled to summary judgment on Mr. Eldridge's failure-to-intervene claim.

## C.  <u>Medical Care</u>

The Eighth Amendment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'"

*Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

"A medical condition is serious if it 'has been diagnosed by a physician as mandating treatment' or 'is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). Deliberate indifference requires a finding that the Defendants "consciously disregarded a serious risk to [Mr. Eldridge]'s health." *Dean v. Wexford Health Sources, Inc*., 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up). Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, the plaintiff must offer evidence that the defendants "actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

The "division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019). Generally, a custodial officer is justified in relying on medical practitioners to care for prisoners' medical needs. *Id.* But this deference is justified only if the "prisoner is under the care of medical experts." *Id.*

The Defendants argue that Mr. Eldridge did not suffer a serious medical need following their uses of force. Again, the evidence does not compel that conclusion. Viewed in the light most favorable to Mr. Eldridge, the record establishes that he was slammed to the ground and shocked three times with a Taser. As a result, his knees were split open, his head was swollen, and he suffered blisters on his back. The Defendants do not account for these symptoms in their argument that Mr. Eldridge did not suffer a serious medical need, (*see* Dkt. 60 at 16), and therefore have not persuaded the Court that no reasonable trier of fact would find that they required medical care.

The Defendants also argue that they were not deliberately indifferent to Mr. Eldridge's medical needs. It is beyond dispute, however, that both Defendants were involved in taking Mr. Eldridge to the ground, and that they knew he was shocked multiple times with a Taser. A reasonable trier of fact could find from those undisputed facts alone that the Defendants knew Mr. Eldridge was subjected to a substantial risk of harm. *Petties*, 836 F.3d at 728. Yet, neither Defendant took any steps to ensure that Mr. Eldridge received any attention for his injuries. Officer Weddell escorted Mr. Eldridge to his cell and past a nurse who asked him if he was suicidal but provided no other medical attention. The Defendants knew Mr. Eldridge could be seriously injured but could not assume that he was in the capable hands of medical professionals. *Giles*, 914 F.3d at 1049. To the contrary, Officer Weddell knew he received no treatment at all.

Finally, the Defendants argue that they cannot be liable for any deliberate indifference to Mr. Eldridge's medical needs because they were not personally responsible for him following their use of force (Dkt. 60 at 15). The Court is not persuaded. Defendants have articulated a basis for finding them deliberately indifferent. Sgt. Konkle pulled Mr. Eldridge to the ground and knew he was tased three times but took no steps to ensure he received medical attention before he was taken to segregation. Officer Weddell tased Mr. Eldridge three times and escorted him to segregation past a nurse whom he knew never assessed or treated his injuries. The Defendants were adequately aware of Mr. Eldridge's condition, and there is sufficient designated evidence to show they were personally responsible for Mr. Eldridge, at least through his arrival in the dry cell.

## IV. <u>CONCLUSION</u>

For the reasons explained above, the Defendants' Motion for Summary Judgment, Dkt. [58], is **DENIED**. Mr. Eldridge's claims must be resolved by settlement or trial.

The Court notes that Mr. Eldridge has been released from prison. The **clerk is directed** to update Mr. Eldridge's address as it appears below. The **clerk is directed** to include a form motion for assistance recruiting counsel with Mr. Eldridge's copy of this order. If he wishes for the Court to recruit counsel to assist him through final judgment, he must return the completed form **no later than March 24, 2025**. Regardless, Mr. Eldridge will have **through March 31, 2025**, to notify the Court of his current address and telephone number (*See* Dkt. 7).

**SO ORDERED.**

Date: 3/5/2025

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

JOSHUA ELDRIDGE
108517
IDOC Re-Entry Parole District (1)
2596 N. Girls School Rd.
Indianapolis, IN 46214

Elijah B. Mollet
Lewis And Wilkins LLP
emollet@lewisandwilkins.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com

William Dean Young
Lewis And Wilkins LLP
young@lewisandwilkins.com